Filed 6/30/16  P. v. Williams CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B255785 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA126561) |
| v. | |
| DAMON DEVON WILLIAMS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kelvin D. Filer, Judge.  Affirmed.

Edward J. Haggerty, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, and Corey J. Robins, Deputy Attorney General, for Plaintiff and Respondent.

A jury convicted defendant and appellant Damon Devon Williams (defendant) of the 2007 assault, forcible sodomy, and rape of Patricia B. and the 2012 murder of Terrey W. During trial, the prosecution presented evidence—including DNA evidence—to establish defendant committed the charged crimes against both victims. With the trial court's permission, the prosecution also introduced evidence pursuant to Evidence Code[1] sections 1101 and 1108, namely, evidence defendant forcibly sodomized his then-girlfriend T.T. in 2010. We consider whether the trial court abused its discretion when it denied defendant's motion to sever trial of the count charging defendant with Terrey's murder from the sexual offense charges involving Patricia, when it ruled evidence of the uncharged sodomy offense was admissible, and when it declined to grant a mid-trial continuance. We also decide whether the prosecution committed misconduct in delivering its rebuttal argument and whether the trial court erred in imposing sentence.

## I. BACKGROUND

### A. The 2007 Crimes Against Patricia B.

On the night of June 23, 2007, 17-year-old Patricia was working as a prostitute in the area of 98th Street in South Los Angeles. She went to a gas station to get a cigarette, and encountered defendant. Patricia got in defendant's car, and they drove to an alley. When they got to the alley, defendant offered her crack cocaine and they smoked it together. After that, Patricia orally copulated defendant.

Patricia then engaged in vaginal intercourse with defendant. While having sex, Patricia felt defendant put his finger into her anus. Patricia pushed his hand away, and she did not want to have anal sex. Defendant became violent, pushing Patricia out of the vehicle and then hitting and kicking her while she was on the ground. He then began to choke her. Patricia was frightened, had trouble breathing, and felt like she was going to lose consciousness. Patricia managed to get up, but defendant hit her on the right side of her head and began to choke her again. Defendant got Patricia back inside the vehicle

---

[1] Undesignated statutory references that follow are to the Evidence Code.

2

and had vaginal sex with her again, this time forcibly.  He then anally penetrated her with his penis without her consent, which was painful.  While crying, Patricia told defendant to stop and screamed for help.  He told her to shut up, adding "Bitch, I'll kill you" and "I'll kill you if you say anything else."  Patricia thought that she was going to die.  Defendant next forced Patricia to orally copulate him, saying "This ain't working.  Give me more head."

As defendant's forcible sexual assault ended, Patricia saw a police car drive by.  She got up and ran to the police saying, "He raped me."  At the time, Patricia was dressed only in a shirt, naked from the waist down.

Police had been called to the area by Benedicto Vazquez.  When Vazquez left his home to warm up his car at around 4:40 a.m., he heard the sound of a man and a woman yelling in a nearby alley.  The woman was yelling for help, but Vazquez could not tell what the man was saying.

Los Angeles Police Department (LAPD) officers Thomas Callian and Jack Rizzotto were the officers who arrived in the area in response to Vasquez's call.  As they stopped their vehicle, the officers saw Patricia come out from behind a Ford Bronco and run toward them.  Patricia was crying and she yelled, "He raped me.  He raped me.  He raped me."

After Patricia got to the patrol car, the officers saw defendant appear from the side of the Bronco.  They ordered him to move to a fence along the alley, but defendant ran instead.  The officers gave chase, defendant eventually fell down, and the officers arrested him.

Police took Patricia to the hospital, where Alexa Benson, a nurse practitioner and a forensic nurse examiner, conducted a sexual assault examination on her.  Benson noticed a hematoma on Patricia's scalp as well as swelling and redness on her left brow.  Benson also observed petechia, which is the leakage of blood from small blood vessels that is caused by blunt trauma or increased capillary pressure.  Benson noted bleeding in Patricia's right eye, which was likely the result of increased capillary pressure.  There was also an abrasion on the right side of Patricia's jaw and a two-centimeter laceration to

3

her right ear.  There was also some bruising to Patricia's right chest wall and clavicle, as well as a bruise on her right thigh.

In conducting a vaginal exam of Patricia, Benson did not see any acute genital injuries.  In performing an external anal examination on Patricia, Benson saw no injuries but Patricia declined to undergo an analscopic exam that would have revealed whether there were injuries that were not outwardly visible.  Benson opined the absence of observable injuries was not inconsistent with Patricia's claim of forcible anal intercourse. Benson also swabbed various parts of Patricia's body, including her mouth, her neck, her breasts, vulva, anus, and vagina for DNA testing.

Forensic analyst Amanda Duda performed DNA analysis on swabs taken from Patricia's body.  The epithelial fraction of the external vulva sample included a mixture of DNA from two individuals, Patricia and a male contributor.  Duda compared the male contributor's DNA profile with defendant's and found that they were consistent.  Owing to the small sample size, however, Duda estimated the statistical probability a randomly selected individual having no connection to the crime would be included as a contributor was only one in five thousand, or one in 380 if limited to the African-American population.

In analyzing the anal swab from Patricia, Duda found a mixture of DNA in the epithelial fraction.  Duda determined the DNA was from Patricia and from a male contributor consistent with defendant's DNA profile.  The statistical probability that Duda would find the same DNA profile in another random African-American person was 1 in 55 million.

### B.    The 2012 Murder of Terrey W.

On the night of September 17, 2012, Faustino Flores was driving to a friend's house when he noticed a black Ford Bronco driving slowly in front of him on Grand Avenue near 92nd Street.  The Bronco turned onto 93rd Street, and Flores did as well. Flores stopped briefly at a liquor store at the corner of 93rd and Broadway, and then drove down Broadway to 94th Street.  Near the intersection of 94th Street and Grand,

4

Flores saw the black Bronco again. The Bronco was parked and there was an African-American man, who Flores described as about six feet tall, standing in the back with the rear door open. Flores thought the man was dumping trash from the vehicle; the area was parallel to the 110 freeway, and Flores knew it was common for people to dump trash in that area. The Bronco's rear door opened sideways, however, and Flores did not see the man actually dumping anything.

Flores continued to his friend's house at 93rd and Grand. Flores's grandfather also lived in the house, and when Flores went inside, he saw his grandfather watching television. Not long after Flores arrived, he heard his grandfather yelling, "There's a car burning." Flores went outside and looked down the street toward the fire in the area where he had seen the Bronco parked. Flores heard someone say, "It's a body," and he ran over to the fire and saw it was a human body burning. Flores told his grandfather to grab a fire extinguisher, which he did and used to put out the fire.

An arson investigator with the Los Angeles County Coroner's Office subsequently arrived at the location where the burned body was found. The investigator saw the female body was mostly burned, including remnants of sandals that were burned into the victim's feet. An LAPD officer that responded to the scene found a large gold loop earring in a nearby grassy area. The authorities took the victim's body to the Los Angeles County Coroner's Office, and later identified the victim as 17-year-old Terrey W.

### 1. Events Leading Up to Terrey's Disappearance and Death

Terrey had last been seen by her family "a couple of days" before her body was found. At that time, she was living with her sister, Shavon W. The last day Shavon saw her sister, Terrey changed into a black dress and shoes and said she was going to see a friend. Shavon identified the gold loop earring the police found near her burned body as one that Terrey was wearing when she left that day.

When Shavon returned home later that evening, Terrey was not there and she did not return home that night or contact Shavon. That was unusual, and Shavon checked

5

Terrey's Facebook page but there was no indication she had been active on Facebook. At some point, Shavon noticed that there had been calls to her phone line from a number with a 600 prefix that Terrey previously called. Police determined the phone number belonged to Tyshawn Givens.

Givens met Terrey through Facebook when she contacted him with questions about how to make some money. Givens falsely represented he was a "male entertainer" or porn actor (he was actually a tattoo artist), and Terrey wanted to work in the porn industry to earn money. Givens told Terrey that she could make thousands of dollars "doing porn," and he gave her his phone number and told her to text him.

After an exchange of text messages, Givens and Terrey agreed to meet. Terrey came to Givens's house on September 15, 2012, (two days before her body would later be found) at around 2:00 or 3:00 p.m. Terrey and Givens talked, and the two engaged in oral sex. They then continued talking into the night, and Terrey was insistent about making money that day. Givens suggested she could make some money working as a prostitute, explaining there were women who did so on Western Avenue. Terrey agreed to do so.

Givens and Terrey walked to 29th and Western. Givens sat down on a bench, and Terrey stood on a corner until men drove up and stopped. The first person to stop and pick up Terrey arrived in less than five minutes. After about 15 minutes, Terrey returned, and a short time later, she left with another person. Terrey again came back about 10 or 15 minutes later, and the same pattern repeated another two to three times.

After a lull in customers, Givens saw another car arrive. He saw the lights flash, he heard a door slam, and the car then drove off. Terrey was gone, and Givens waited for her to return as she had on the prior occasions. But she did not, and after an hour, he began to get worried and sent her a text asking where she was. Terrey did not respond. Givens waited a while longer, perhaps another hour, and he called Terrey and texted her again as he waited, but he received no reply.

Givens eventually took a bus home. When he arrived home at around 3:00 a.m., he saw that he had received a text from Terrey's phone that stated she was on her way

6

back.  Givens went to sleep, but he tried to contact Terrey the next day.  Givens did not hear back from Terrey, and he later learned through Terrey's Facebook page that she was dead.

### 2. *Investigation*

Los Angeles County Coroner's Department Deputy Medical Examiner Louis Pena conducted an autopsy on Terrey.  Pena could not determine if there were any injuries to the genital or anal area because the body was too badly decomposed.  He was able to observe a jagged fracture of the hyoid bone in the neck with blood surrounding the area, indicating Terrey was alive at the time that neck compression took place.  In Pena's opinion, the primary cause of Terrey's death was strangulation.  Terrey was not breathing at the time she was burned because there were no signs of inhalation of soot or other combustion byproducts.  It was difficult for Pena to estimate Terrey's time of death, but the level of decomposition was consistent with her having been killed sometime between 1:00 and 4:00 a.m. on Sunday, September 16, 2012, and the following Monday night, when her body was found burning.

LAPD criminalist Samuel Sund analyzed a red stain on Terrey's earring that police recovered, and the stain tested presumptively for blood.  Sund found a mixture of DNA present in the blood stain, with a male being the major contributor to the mixture.  The male DNA was consistent with defendant's DNA profile, and the likelihood there would be another contributor sharing this same DNA profile was one in ten trillion unrelated individuals.

Sund also tested anal and vaginal swabs taken from Terrey for DNA.  On the anal swab, Sund separated the sample into a sperm cell fraction and an epithelial cell fraction.  Sund determined the sperm fraction was from a single male source.  There were two contributors to the epithelial fraction, one of whom could have been Terrey.  Sund also tested the vaginal swab for DNA.  The sperm fraction from the vaginal swab was determined to be a mixture with the major contributor being a male.

7

The source profile from the sperm fraction of the anal and vaginal swabs taken from Terrey matched defendant's DNA profile. The likelihood that an unrelated person, rather than defendant, would match the DNA profile found in the sperm fractions of the vaginal and anal swabs was one in four hundred quadrillion. Sund also determined defendant was a possible contributor to the epithelial cell fraction of the anal swab, and it was one billion times more likely that defendant was the contributor to the sample than a random person. Sund further determined defendant was a possible contributor to the epithelial cell fraction of the vaginal swab, and it was one billion times more likely that defendant was the contributor to that sample than a random person. Givens was excluded as a possible contributor to the DNA found on the earring and also to the epithelial cell fractions from the vaginal and anal samples.

The police also obtained defendant's cell phone records for the period of time between September 14 and September 18, 2012. Analysis of the records by law enforcement indicated defendant's phone was in the vicinity of 93rd and Grand Avenue between 9:26 p.m. and 9:45 p.m. on September 17, 2012, i.e., close to where Terrey's burned body was found and within hours of its finding.

### 3.    *Testimony from Defendant's Relatives*

The prosecution called defendant's wife, Cicily Freia, to testify as a witness at trial. She told the jury that in September 2012, defendant drove a Ford Bronco, the color of which was a shade somewhere between black and dark grey. For several months prior to September, Freia said she consistently saw a red gas can in the back of the Bronco.[2]

Freia heard news reports around September 17, 2012, about a woman who had been set on fire "somewhere on 95th Street," which was near where defendant's nephew Curtis Ward lived. The night she heard he reports, Freia called defendant to see if he was in the area of where the body had been found because he was frequently at his nephew's

---

[2]    Police found a red gas can during a search of the garage at defendant's home.

8

house.  Defendant, however, did not answer his phone and he did not come home that night.  Freia did not see him until about 7:00 or 7:15 p.m. the next evening.

When defendant was in custody awaiting trial on the charged offenses in this case, he talked to Freia on the phone from jail, sometimes with his sister or his mother also on the line.  During one of these calls, all of which were recorded by the jail facility, defendant asked Freia to use Google to search for information about DNA—in particular, how long it "stay[s] alive."  During another call, defendant told Freia to call a friend named Fraser and tell him to come and pick up a tire that was on the side of their house that had come from the Bronco defendant drove.  (When police searched defendant's home on the day he was arrested for Terrey's murder, they did not seize the tire.)  Defendant later asked Freia if the tire had been picked up, but she saw it was still against the wall of the house.  In a later three-way call with his sister and Freia, defendant told his sister to come and get "the thing."  Afterwards his sister came over to Freia's house and took the tire.[3]

The prosecution also presented testimony from defendant's nephew Curtis Ward.  Ward said he had a close relationship with defendant.  According to Ward, he would "hang out" with defendant at defendant's mother's house, at a "bookie joint," or at Ward's grandmother's house which was on 95th and Broadway.  (The defense would later argue to the jury in closing that the close proximity of Ward's grandmother's house to the area where police recovered Terrey's body provided an innocuous explanation for why defendant's cell phone records showed he was in that area on the night in question.)

In conversations with Ward, defendant said he sometimes picked up prostitutes in the area of Figueroa and Western.  According to Ward, defendant said he generally likes younger women around 18 or 19 years of age.  After defendant was arrested, he talked to

---

[3]     In addition, during the week before Freia testified at trial, defendant talked to Freia each day and told her she did not have to testify because they remained married.  Defendant's mother also called Freia the day before she testified and reminded her she did not have to testify against him because their divorce was not yet final.

Ward on the phone and asked him to check to see if there were any cameras in the general vicinity of Ward's grandmother's house. Ward went outside and checked, but did not see any type of surveillance cameras.

*C.      Forcible Sodomy Against T.T. (Admitted at Trial Under Evidence Code Sections 1101 and 1108)*

T.T. dated defendant for roughly seven or eight months in 2009 and 2010. One evening in February 2010, she and defendant began having consensual vaginal intercourse. While engaged in the act, defendant asked if he could have anal sex and T.T. responded, "hell no." Undeterred, when T.T. turned over onto her stomach, defendant grabbed her hands, held them above her head, pressed his chest on her back, used his leg to open her legs, and then forced his penis in her anus. This hurt "real bad," and and she tried to get away to no avail. While crying, she repeatedly told defendant to stop, but he did not; instead, he continued anally raping her.

When finished with the anal assault, defendant continued to hold T.T. down on the bed until he fell asleep. She eventually fell asleep too. When she woke up, defendant got up and left. In the immediate aftermath of the incident, T.T. did not call the police because she did not want her neighbors or others to know what happened. However, when T.T. heard that defendant had been arrested in connection with the Terrey murder, T.T. told her mother what defendant had done to her. Her mother told her to call the police, which she did.

*D.      Jury Verdicts and Sentencing*

The jury convicted defendant of first degree murder (Pen. Code, § 187, subd. (a)), assault by means of force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(4)), forcible rape (Pen. Code, § 261, subd. (a)(2)), forcible sodomy (Pen. Code, § 286, subd. (c)(2)(a)), and forcible oral copulation (Pen. Code, § 288a, subd. (c)(2)(a)). The trial court sentenced defendant to a total term of 49 years to life in state prison, consisting of a term of 25 years to life for the murder conviction plus three consecutive eight-year

10

terms for the sexual assault offenses. The court also imposed a concurrent four-year prison term for the assault likely to produce great bodily injury conviction. The court imposed two fines of $10,000 each, pursuant to Penal Code sections 1202.4 and 1202.45.

## II. DISCUSSION

Defendant advances a number of challenges to his convictions and sentence. Among other things, he claims the prosecutor committed misconduct during rebuttal argument and he asserts the trial court should not have permitted his former girlfriend T.T. to testify about the uncharged sexual assault in 2010. We conclude these challenges lack merit. Taken in context, we do not believe the prosecutor's rebuttal to the defense argument about certain of defendant's jail calls was improper, and we have no doubt the rebuttal argument was harmless even if the words the prosecutor used did stray over the line into improper argument. Nor did the trial court abuse its discretion in admitting the evidence concerning the assault on T.T. under Evidence Code section 1108 (it was not substantially more prejudicial than probative) and Evidence Code section 1101 (it was appropriate evidence of a common scheme or plan). We also reject the additional unavailing arguments defendant raises on appeal, discussing all the issues in the order defendant has presented them to us for our consideration.

### A.    *Motion to Sever*

Defendant claims the trial court should have granted his motion to sever trial of the count charging him with Terrey's murder from the charges involving Patricia. He argues severance was warranted because the evidence supporting the murder charge was weak in comparison to the evidence supporting the offenses against Patricia, because there was no evidence which would be cross-admissible if the counts were tried separately, and because each incident involved inflammatory facts. He contends the asserted error in conducting a joint trial was prejudicial, and he further contends it violated his federal constitutional right to due process.

11

*1.      Applicable law: preference for joint trial of similar offenses*

Penal Code section 954 allows the People to join charged offenses for trial where they are connected together in their commission or where they belong to the same class of crimes; the statute also recognizes trial courts retain discretion to sever the counts "in the interests of justice and for good cause shown." (*People v. Jones* (2013) 57 Cal.4th 899, 924-925; *People v. Scott* (2011) 52 Cal.4th 452, 469.)  The law prefers consolidation of charges because it usually promotes efficiency. (*People v. Scott*, *supra*, 52 Cal.4th at p. 469.)  Thus, section 954 expresses the legislative preference for joint trials of similar offenses committed by a defendant. (*People v. Sullivan* (2007) 151 Cal.App.4th 524, 557.)

To warrant separate trials, a defendant must demonstrate a "substantial danger of prejudice" requiring severance. (*People v. Gonzales* (2011) 52 Cal.4th 254, 281; *People v. Catlin* (2001) 26 Cal.4th 81, 110.)  Courts consider four factors in determining whether severance should be granted: (1) whether evidence of the joined crimes would be cross-admissible; (2) whether one or more of the joined crimes would be inflammatory and prejudice the jury against the defendant; (3) whether consolidation would join a weak case with another weak case or a strong case so the outcome might be biased in favor of conviction in a way it would not if tried separately; and (4) whether any of the charges carries the death penalty. (*People v. Jones*, *supra*, 57 Cal.4th at p. 925; *People v. Scott*, *supra*, 52 Cal.4th at pp. 469-470.)

We review a trial court's decision on a severance motion for abuse of discretion in light of the record before the court at the time of the ruling. (*People v. Jones*, *supra*, 57 Cal.4th at pp. 924-925; *People v. Scott*, *supra*, 52 Cal.4th at p. 469.)  Where the statutory requirements for joinder are met, error in consolidating counts can be shown on appeal only upon a """clear showing of potential prejudice.""" (*People v. Jones*, *supra*, 57 Cal.4th at pp. 924-925.)

## 2. *The trial court's ruling*

Before deciding the motion for severance, the trial court ruled evidence of the crimes against Patricia was admissible under section 1101, subdivision (b) to prove intent, modus operandi, and identity as to the Terrey murder. The court found the two crimes sufficiently similar to justify application of section 1101, subdivision (b) because both victims were African-American prostitutes of a similar age who were picked up in the evening, defendant's vehicle was implicated in both crimes, defendant's DNA was found in both victims, both victims were strangled, and the incidents occurred in close geographic proximity to each other.

Turning to the question of whether to sever the charges, the court noted it had found the evidence of the assault offenses and the murder was cross-admissible. It was undisputed neither charge was a capital charge, and essentially undisputed that both were the same class of crimes. The court found it was not "a situation where it's a weak case being joined with a strong case to bootstrap one to the other." The court further found judicial economy, while not a major factor, supported consolidation.

The court acknowledged defense counsel's concerns that Patricia could appear "sympathetic" to the jury,[4] but the court believed counsel could explore the issue in voir dire to ensure the jurors would decide the case solely on the evidence. In addition, the court noted it would give the customary jury instruction forbidding jurors from considering "sympathy, passion or prejudice." The court also stated it would be willing to give a special jury instruction relating to Patricia's "unique circumstances" (no such instruction was ultimately requested), and the court stated the jury would be instructed that certain evidence was being admitted for a limited purpose.

---

[4] After the incident with defendant in 2007, another man hit Patricia in the head with a crowbar, which caused a severe head injury that kept her in a coma for two years and left her wheelchair-bound.

13

### 3. *The trial court did not abuse its discretion in denying severance*

We hold the trial court was well within its discretion when it denied severance. Each of the four factors we consider when determining whether severance should have been granted supports the trial court's ruling.

The statutory requirements for joinder were met in this case as the crimes in question were all of the same class. (See, e.g., *People v. Geier* (2007) 41 Cal.4th 555, 574-575 [murder, rape, and other forcible sex crimes are all assaultive crimes against the person]; *People v. Maury* (2003) 30 Cal.4th 342, 395.) Thus, the joinder of charges was presumptively proper. (Pen. Code, § 954; *People v. Scott*, *supra*, 52 Cal.4th at pp. 452, 469.)

Defendant contends the trial court erred in finding the evidence to be cross-admissible. Cross-admissibility is a factor which favors joinder, but the lack of cross-admissibility alone does not require severance where crimes of the same class are joined. (*People v. Jones*, *supra*, 57 Cal.4th at p. 925.) Although not required, cross-admissibility of evidence was present here.

Defendant argues the evidence concerning the assault on Patricia was not cross-admissible on the murder charge because there were no sex offenses charged in connection with the Terrey murder. Defendant claims there was nothing to suggest that he had any non-consensual sexual contact with Terrey and so the forcible sex offenses against Patricia had no probative value to the Terrey murder charge.[5]

The trial court recognized that there were no sex charges brought in connection with Terrey but found the conduct that led up to Terrey's murder was very similar to the conduct in the Patricia incident. We agree with the trial court's assessment, and these

---

[5] Although no sex offenses were charged against defendant, Terrey was 17 years old at the time of her death. Thus, defendant's act of sodomy with her was a crime, albeit a misdemeanor. (Pen. Code, § 286, subd. (b)(1).) Defendant's act of vaginal intercourse with her was also a crime, which could be categorized either a misdemeanor or a felony. (Pen. Code, § 261.5, subd. (c).)

similarities are sufficient to justify the court's conclusion the evidence was cross-admissible under section 1101, subdivision (b).

In each incident, defendant picked up a teen-aged prostitute and took her to a more isolated area where the evidence indicated they engaged in vaginal and anal intercourse. Both incidents occurred in fairly close geographical proximity. Each victim was strangled during or after intercourse; Terrey's strangulation resulted in death, Patricia's did not. These are striking similarities and evidence of a common modus operandi.

We disagree with defendant's suggestion the incident involving Patricia could not be probative of his guilt as to Terrey's murder because there was no evidence from which one could infer the vaginal or anal contact between defendant and Terrey was non-consensual. It was defendant's blood, not Terrey's, found on her earring,[6] and strong circumstantial evidence pointed to defendant as the person who dumped and burned her body. A factfinder could reasonably infer from these facts some confrontation between the two must have occurred and, given the lack of any prior existing relationship, the confrontation was linked to the sex acts. (Cf. *People v. Stitely* (2005) 35 Cal.4th 514, 550 [idea that defendant and victim, who were virtual strangers, fought violently about bar-hopping rather than sex inherently implausible].) True, there is nothing approaching incontrovertible proof that sex between defendant and Terrey was non-consensual, but Patricia was also a prostitute and she did not consent to every act of sex with defendant. The absence of stronger evidence of non-consensual sex does not significantly reduce the strong similarities between the two victims.

None of the other factors we routinely consider favored severance either. As to whether the charges were inflammatory, we believe a comment made by defendant's trial

---

[6]     Although there was evidence that defendant sustained a cut on his hand on September 9, 2012, and received stitches, there is nothing to suggest that this cut would have bled at the time of Terrey's death a week later without further trauma. Defendant's wife testified the only time she saw blood on defendant's hand was on the day he sustained the injury. Ward testified that he saw defendant a couple of days after the injury occurred. Defendant appeared to be in pain, but Ward did not testify he saw any blood.

attorney during the severance motion hearing hits the nail on the head: "Neither one is more inflammatory than the other. They are both at the very top." That is to say, while murder is a quite serious crime, the attack on Patricia was also extreme, and like Terrey's murder, involved choking. Both victims were also teenagers and both were subjected to anal sex. On the question of the relative strength of the evidence, it was not markedly different for both victims—the case against defendant was strong on both. DNA found on or in the vagina and anus of both victims linked defendant to the charged crimes. While police found defendant in midst of committing the offenses against Patricia and there was no similar direct evidence implicating defendant in Terrey's murder, there was nonetheless a strong circumstantial case for his guilt.[7] Defendant's blood was found on Terrey's earring. An African-American man driving a car like defendant's car dumped Terrey's body and set it on fire. Defendant's cell phone was used in the area close to the time of the fire. And defendant's jail calls, with questions about how long DNA remained viable and questions about the existence of surveillance cameras near where Terrey was found, provided an ample basis for a factfinder to infer consciousness of guilt. Thus, the trial court did not abuse its discretion by denying defendant's severance motion.

### 4. No due process violation occurred

Even if correct when made, a trial court's ruling joining counts must still be evaluated retrospectively to determine whether joinder of counts resulted in gross unfairness depriving the defendant of due process of law. (*People v. Gonzales*, *supra*, 52 Cal.4th at p. 281.) Here, no prejudicial and improper evidence was admitted against

---

[7]     In a candid moment, when discussing whether the trial court should have granted a mid-trial continuance of the proceedings, even defendant's opening brief recognizes there was "considerable" circumstantial evidence he committed the murder: "[G]iven the DNA evidence, the cell phone records and the eyewitness testimony placing a Ford Bronco in the vicinity of the body when it was dumped and set on fire, Williams had to present evidence that someone else had killed Terrey, since the prosecution had considerable circumstantial evidence pointing toward him."

defendant as a result of joinder, and the properly admitted evidence for the crimes against each victim is fairly characterized as overwhelming. Thus, joinder resulted in no unfairness against defendant.

### B. *Prosecutorial Misconduct Claim*

The jail facility in which defendant was held recorded over 300 of his telephone calls. During trial, the court held hearing on the use of statements he made during these calls and the prosecution sought to admit a number of inculpatory statements. Defense counsel argued certain exculpatory statements defendant made during the calls should also be admitted because they put his inculpatory remarks into context and were therefore admissible. (§ 356 [when conversation admitted in evidence, any other part of the conversation necessary to make it understood may also be admitted in evidence].) The prosecution countered that many if not all of the exculpatory statements were hearsay.

The trial court largely agreed with the prosecution, but admitted two of defendant's statements identified by defense counsel. First, during the jail call when defendant asked his wife to research how long DNA "stay[s] alive," defendant added he thought the police were trying to set him up. Second, during a call when defendant made statements about the tire outside his home (which his sister ultimately came to pick up), defendant said "it's hard enough for me to remember last month than four months ago." In addition to these two statements, the jury also heard a third statement by defendant on another call that was arguably exculpatory: "I got a family, man. I got sisters and shit. I don't get down like that."

Defendant contends the prosecutor made a comment on the evidence she knew to be untrue during the rebuttal phase of closing argument. According to defendant, the prosecutor made "the misleading assertion that [defendant] had never denied his involvement in the crimes charged during the phone calls with his family and friends." Defendant urges us to conclude the prosecutor engaged in misconduct warranting reversal, either outright or on the ground the trial court should have granted his motion for a mistrial.

17

## 1. The closing arguments

In her summation, the prosecutor told the jury, "[Defendant's] phone calls tell us: I'm guilty. I'm guilty. That's what he is saying when he makes all those phone calls. He's trying to destroy evidence. . . . This is what he is thinking about when he is arrested for the crime. . . . Let me find out are there cameras that are going to get me in trouble."

During the defense's closing argument, counsel attacked the prosecution's contention the jail calls admitted in evidence should be treated as evidence of guilt. Instead, the defense argued defendant's statements were more consistent with the notion that defendant wanted to find evidence that would exonerate him. Counsel sought to explain away, for instance, defendant's question to Ward about whether there were surveillance cameras near where Terrey's body was recovered by arguing defendant hoped there was video footage that would show he was not there. Regarding the phone calls where defendant discussed the tire outside his home he wanted picked up, counsel pointed to defendant's statement that it was hard for him to remember what happened one month ago, much less four months ago, which in counsel's view was "information that points towards his innocence." In addition, defense counsel made reference to certain questions defendant asked on the calls about how cell phone companies could track phone users and said "it sounds like he's trying to get information to prove that [he is] innocent here." Last, defense counsel also pointed to the call on which defendant asked his wife about DNA, emphasizing defendant also said, "They're trying to set me up," which counsel argued was a protestation of innocence.

In rebuttal, the prosecutor responded to the defense attorney's attempt to portray the jail calls in an innocuous light. She argued, "Jail calls. Like I said, if you listen to them and you decide you know, I don't know where the defendant said on the calls I didn't do it. I didn't hear a part where he said: Hey, go check on the cameras. Hopefully if there is camera footage that's going to show that wasn't my car, because it can read the license plate and we can get it all going. Yeah, he doesn't say that. [¶] Or the tire. He doesn't say: Move the tire. He said: get rid of it. Or yeah. The phone tracking. He never said anything about: Gosh, see if they can connect it because if they do track it

18

then maybe you can show I wasn't there. Right. Yeah. He never said that. So I don't know where there is evidence. [¶] And I'm submitting to you that is not reasonable. You get arrested on a murder and you're calling people and saying: check to see if Boost can track T-Mobile and Metro P.C.S. If they can track me beforehand. Oh, okay, check and let me know. [¶] You think that is reasonable? That it was just a: Oh, I'm trying to prove my innocence? Let me start working on my defense. Hey, it's up to you guys. Do you think that is a reasonable interpretation of the evidence? I don't. I don't. But you listen to all the calls and think about what is reasonable in light of your experience and what you think someone who just got arrested for murder would say."

Defense counsel did not object to this argument during the prosecutor's rebuttal. The next day, however, defense counsel did object, arguing in relevant part: "[The prosecutor] made an argument about there not being any denials on any of the phone calls, but clearly there were. The court excluded those denials. There were not only denials in the entire calls that were played to the jury, but there were some in other phone calls that the court excluded, and I think it's not fair to the defendant for the jury to be left with the impression that [defendant] never denied being responsible for these charges, when over and over again over his hundreds of phone calls, that's all he continued to do." Defense counsel moved for a mistrial, and in the alternative asked the court "to instruct the jury to disregard that argument about there were no statements about the defendant denying any of this stuff."

The trial court denied the defense motion for a mistrial. The trial court stated the prosecutor "was careful to say she was referencing the evidence and referencing the calls that were in court as to what [defendant] did not say. . . . I don't think there was anything inappropriate done in this instance because she was careful to make reference to the evidence that was admitted into court."

Explaining further, the trial court continued: "I did let in at least two areas where [defendant] denied [guilt] and denied the charges and indicated he thought they were trying to set him up, and that's why he wanted these individuals on the phone to avoid doing certain things. So there is evidence of that. So I think there may have been a

19

misstatement, not intentional, but the jury is going to hear there was a denial from him in the tape, if they want to listen to it again. . . . I just think that was a misstatement. And I don't think it harms the defendant because they hear him deny the charges on there."

### 2. *Forfeiture*

To preserve a claim of prosecutorial misconduct, the defendant must object at the time the misconduct occurs and request a curative jury admonition. *(People v. Tully* (2012) 54 Cal.4th 952, 1010; *People v. Thomas* (2012) 54 Cal.4th 908, 938-939; *People v. Bemore* (2000) 22 Cal.4th 809 (*Bemore*).) As was the case in *Bemore*, defense counsel here did not raise a timely and contemporaneous objection to the alleged misconduct, instead waiting until the following day. (*Bemore, supra*, at pp. 844-846.) Following *Bemore*, we consider the misconduct allegation forfeited.

Defendant attempts to avoid forfeiture by arguing he needn't have objected if a prompt admonition would not have cured the harm caused by the misconduct or if an objection would have been futile. (*People v. McDermott* (2002) 28 Cal.4th 946, 1001.) That is correct insofar as it goes, but here there is no reason to believe either is the case. The trial court could have timely and specifically admonished the jury that they were responsible for determining the facts and that nothing the attorneys said was evidence— which it in fact later did when giving the jury all of its final instructions. Such an admonition would have been appropriately curative, especially because the challenged comments made by the prosecutor pertained to calls that were in evidence and that the jury had already heard for itself.

### 3. *The prosecutor's statement during rebuttal was neither misconduct nor prejudicial*

Although we have found the misconduct claim forfeited, we address the merits in light of defendant's contention, addressed later in this opinion, that trial counsel's failure to object constituted ineffective assistance of counsel. We hold both that the prosecutor

did not commit misconduct and that the challenged statement during rebuttal argument was harmless in any event.

We do not understand the challenged statement by the prosecutor ("if you listen to them and you decide you know, I don't know where the defendant said on the calls I didn't do it") as defendant does, i.e., as a statement defendant never asserted he was innocent of the crimes on any of the jail calls in evidence or on any of the roughly 300 calls overall, the vast majority of which were not presented at trial. Rather, we understand the prosecutor's statement in context to refer to the specific phone calls the prosecutor immediately referenced thereafter: the call with defendant's statements about surveillance cameras, the call with defendant's statements about moving the tire, and the call with defendant's statements about cell phone location tracking. For each of these calls, we believe the prosecutor was within the realm of permissible rebuttal in imploring the jury to consider whether the defense's characterization of the calls—that they were evidence not of consciousness of guilt but rather evidence of his innocence—was reasonable. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1026; see also *United States v. Robinson* (1988) 485 U.S. 25, 31-32 [no misconduct where prosecution argument is fair response to claim made by defendant or his attorney].) Indeed, while defendant made what are *arguably* exculpatory statements on the calls the jury did hear (I think they're trying to set me up, I don't remember, I don't get down like that) none of those statements are necessarily equivalent to "I didn't do it."[8] Both sides argued the inferences the jury should draw from the calls in evidence, and we find the prosecution's rebuttal did not stray into argument predicated on "deceptive or reprehensible methods." (*People v. O'Malley* (2016) 62 Cal.4th 944, 1010.)

Moreover, even if we accepted defendant's out-of-context characterization of the prosecutor's statement as an assertion defendant never claimed to be innocent in any of

---

[8] The closest the arguably exculpatory statements admitted at trial come to "I didn't do it" is probably defendant's statement "I think these motherfuckers are trying to set me up" after asking his wife to research the properties of DNA. The prosecutor did not reference this specific call during her rebuttal argument.

21

the jail calls, we would nonetheless hold the single statement during rebuttal argument did not prejudice defendant. The court instructed the jury: "You must decide what the facts are. It is up to all of you and you alone to decide what happened based only on the evidence that has been presented to you in this trial." The court also instructed the jury: "'Evidence' is the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else I told you to consider as evidence. Nothing that the attorneys say is evidence. In their opening statements and closing arguments the attorneys discuss the case, but their remarks are not evidence." The jurors are presumed to understand, follow, and apply these instructions. (*People v. Hajek* (2014) 58 Cal.4th 1144, 1229, disapproved on other grounds by *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.) The jurors were also well aware, having heard the jail calls themselves, of what it was that defendant said on the calls, including the statements that the defense considered exculpatory. Under the circumstances, we would hold that any misstatement by the prosecutor was harmless under either a state or federal standard of review. (*Chapman v. California* (1967) 386 U.S. 18, 26; *People v. Watson* (1956) 46 Cal.2d 818, 836.) We are reinforced in our view by the state of the evidence, which overwhelmingly weighed in favor of defendant's guilt. He was tied to both victims by DNA evidence. Defendant was caught in the act of committing the crimes against Patricia. Cell phone evidence placed him near where Terrey's remains were left burning, and his vehicle was virtually identical to the one used to dump her remains. The section 1101 and 1108 evidence further cemented the People's case against him. In no way could defendant have been prejudiced by the brief portion of the prosecutor's rebuttal argument he challenges.

### 4. *Motion for mistrial*

A mistrial motion should be granted only if the movant's chances of receiving a fair trial have been irreparably damaged. (*People v. Ayala* (2000) 23 Cal.4th 225, 282.) Because we hold the prosecutor's rebuttal did not cross the line into misconduct and defendant was not prejudiced by the prosecutor's remarks in any event, the trial court did not abuse its discretion in denying defendant's motion for a mistrial. (*People v. Gonzales*

22

(2011) 51 Cal.4th 894, 921 [ruling on mistrial motion reviewed under the deferential abuse of discretion standard].)

### C. Evidence of T.T. Assault in 2010 - Evidence Code Section 1108

Defendant contends the trial court abused its discretion in admitting pursuant to section 1108 evidence that he anally raped his former girlfriend T.T. The court ruled that the T.T. evidence was relevant to the sexual offenses involving Patricia.[9] Defendant argues that the evidence was inadmissible under section 1108 because it should have been excluded as more prejudicial than probative under section 352.[10] Even if the evidence was properly admitted under section 1108, defendant argues reversal is nevertheless required because the statute is unconstitutional.

### 1. Evidence Code section 1108

Evidence of a defendant's character or character trait ordinarily may not be used to prove a defendant acted in conformity with that character or character trait. (§ 1101, subd. (a).) Section 1108, however, allows courts to admit this sort of propensity evidence in sex offense cases "to assure that the trier of fact would be made aware of the

[9]    The court described its initial ruling as tentative. Neither party points to a more definitive ruling by the trial court, but the record indicates that the trial court's tentative ruling was its final ruling as to the admissibility of the T.T. evidence under section 1108. The trial court instructed the jury: "If you decide that the defendant committed the uncharged offense [of sodomy of T.T.], you may, but are not required to, conclude from that evidence that the defendant was disposed or included to commit sexual offenses, and based on that decision also conclude that the defendant was likely to commit and did commit rape, sodomy, and forcible sodomy and oral copulation as charged here in counts 3, 4, and 5."

[10]    The trial court also found the T.T. evidence was "other act" evidence admissible under section 1101, subdivision (b). We consider defendant's claim that the trial court's ruling on section 1101 grounds was also an abuse of its discretion in part II.D of this opinion.

defendant's other sex offenses in evaluating the victim's and the defendant's credibility." (*People v. Falsetta* (1999) 21 Cal.4th 903, 911.)

Section 1108, subdivision (a) provides: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." Section 1108 thus makes admissible evidence of a defendant's uncharged sexual misconduct so long as the probative value of the evidence is not "substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (§§ 352, 1108, subd. (a); *People v. Hollie* (2010) 180 Cal.App.4th 1262, 1274.)

Our Supreme Court has explained, "'"[t]he 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, 'prejudicial' is not synonymous with 'damaging.'" [Citation.]' [Citations.] The prejudice that section 352 is "'designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.'"'" (*People v. Doolin* (2009) 45 Cal.4th 390, 439.)

In conducting a section 352 analysis of evidence offered pursuant to section 1108, courts are to consider the nature, relevance, and possible remoteness of the other sexual offense; the degree of certainty of its commission; the likelihood of confusing, misleading, or distracting the jurors from their main inquiry; the similarity to the charged offense; any likely prejudicial impact on the jurors; the burden on the defendant in defending against the uncharged offense; and the availability of less prejudicial alternatives, such as admitting some but not all of the defendant's other sex offenses or excluding inflammatory but irrelevant details surrounding the offense. (*People v. Falsetta, supra*, 21 Cal.4th at p. 917.) Trial court rulings admitting section 1108 evidence, including the court's analysis under section 352, are reviewed for abuse of discretion. (*People v. Hollie, supra*, 180 Cal.App.4th at pp. 1274-1275.)

24

## 2.    *The trial court properly admitted the evidence*

With respect to both T.T. and Patricia, the trial court found defendant asked for anal sex, was turned down, and then forcibly engaged in the act anyway.  We are unpersuaded by defendant's argument that the anal rape of T.T. was too dissimilar to the anal rape of Patricia to have sufficient probative value that outweighed the prejudicial impact of permitting T.T. to testify about the 2010 incident.

Defendant is correct that T.T. was not a prostitute like Patricia, and she therefore had a different motivation for agreeing to vaginal sex with defendant.  Nevertheless, both women's experience with defendant began with voluntary vaginal intercourse.  They both then refused anal intercourse with defendant.  Defendant then anally raped both women.  Defendant used force on Patricia from the outset.  He convinced T.T. to lie on her stomach, but he then almost immediately used force on her too.  The evidence of defendant's anal rape of T.T. was probative of defendant's predilection to get women into a submissive position and then force them to participate in anal sex with him.  It was highly relevant here, where defendant was charged with having committed forcible anal rape against Patricia.

Defendant protests the uncharged sexual offense evidence was prejudicial because the jury would be overcome by a feeling that defendant's behavior toward T.T. showed "callousness and selfishness" because defendant must have had some form of emotional attachment to T.T.  He argues that the jury would have therefore found his conduct with her highly offensive, but with Patricia, less so.  We see no danger of undue prejudice that substantially outweighs the probative value of the evidence.  Defendant's forcible sodomy of T.T. was not more offensive than his forcible sexual offense against Patricia.  Defendant may have taken advantage of T.T.'s trust to sodomize her, but that is no more offensive than the violence he used to rape and sodomize Patricia.

Defendant additionally argues that the evidence concerning the uncharged sexual assault on T.T. in 2010 was unduly prejudicial because the jurors would have been tempted to punish him for that rape by convicting him of the Patricia crimes regardless of whether they believed the evidence proved him guilty.  Perhaps this would be a concern

if the evidence of the forcible sodomy of T.T. were much stronger than the evidence of the charged offenses against Patricia, but it is not. T.T. did not call the police, did not report the rape for two years, and there was no physical evidence that defendant anally raped her. In comparison, there is no doubt that defendant had anal intercourse with Patricia and the severe beating he inflicted on her makes it extremely unlikely that the intercourse was consensual. Patricia's "he raped me" statements to the arresting officers who responded to her cries for help, and defendant's effort to flee from the officers before they arrested him, are further evidence weighing against any contention Patricia consented to anal sex. The evidence in support of the counts of conviction pertaining to her was strong.

*People v. Harris* (1998) 60 Cal.App.4th 727, the case defendant cites to support his claim the trial court's section 352 determination was an abuse of discretion, is far too dissimilar to be of use to defendant. The *Harris* court held evidence of a prior sexual offense should not have been admitted because (a) it involved a violent physical rape whereas the charges then at issue involved the nonviolent licking and fondling of incapacitated women; (b) the prior offense, which involved a "viciously beaten" victim, was highly inflammatory; and (c) the prior offense was very remote in time, having taken place 23 years before the current offense. (*Id*. at pp. 738-739.) These same considerations are not present here. The anal rape of T.T. occurred within three years of the rape of Patricia; to the extent both incidents were inflammatory, they were inflammatory to a similar degree; and defendant used force when assaulting both T.T. and Patricia.

In his reply brief, defendant asserts that admission of the uncharged sexual offense evidence pursuant to section 1108 also prejudiced him in the trial of the murder charge involving Terrey. He claims at least some jurors would have had a reasonable doubt about his guilt of the Terrey murder absent hearing the T.T. assault evidence. As defendant acknowledges, the T.T. evidence was also admitted under section 1101 to show a common plan or scheme. We discuss defendant's claim concerning section 1101 later in this opinion. Defendant does not explain how he was prejudiced on the murder

26

charge by the admission of the T.T. evidence under section 1108 for the additional limited purpose of permitting the jury to conclude "defendant was likely to commit and rape, sodomy, and forcible sodomy and oral copulation as charged in counts 3, 4 and 5." The jurors are presumed to understand, follow and apply the instructions. (*People v. Hajek*, *supra*, 58 Cal.4th at p. 1229.) Defendant does not explain why jurors would have been unable to follow this instruction, nor how they would have misused the evidence of defendant's assault on T.T. in considering the Terrey murder charge. Thus, his claim fails.

### 3. There was no violation of defendant's rights to due process and a fair trial

Defendant maintains that even if the admission of the uncharged sexual offense evidence under section 1108 complied with state law, it rendered his trial fundamentally unfair and violated his federal constitutional due process rights. (See *Jammal v. Van de Kamp* (9th Cir. 1991) 926 F.2d 918, 919.)

In support of his claim of a due process violation, defendant offers essentially the same arguments: that the trial court erred in admitting evidence of the 2010 sexual assault on T.T.; that T.T. was more credible than Patricia, who was a prostitute; and that if the jury had doubts about Patricia's testimony, they were likely to overlook these doubts and convict him of the charges in this case to punish him for the more convincing but unpunished crime against T.T. We continue to find these arguments unconvincing.

"To prove a deprivation of federal due process rights, [a defendant] must satisfy a high constitutional standard to show that the erroneous admission of evidence resulted in an unfair trial." (*People v. Albarran* (2007) 149 Cal.App.4th 214, 229.) The question is whether a trial court error rendered the trial arbitrary and unfair such that a due process violation occurred. (*Id*. at pp. 229-230.) Defendant has not met this high standard.

### 4. Constitutionality of Evidence Code section 1108

27

Defendant urges us to reverse even if the admission of T.T.'s testimony was proper under section 1108. He argues section 1108's license to admit evidence of other sex crimes to prove propensity to engage in such crimes violates his rights to due process and equal protection of the laws. Respondent contends defendant has waived these claims by failing to object in the trial court. We consider the claims because they involve a question of law based on undisputed facts. (*People v. Yeoman* (2003) 31 Cal.4th 93, 118; see *People v. Hines* (1997) 15 Cal.4th 997, 1061 [constitutionality of a statute].)

As defendant acknowledges, the California Supreme Court has rejected the same due process challenge to the constitutionality of section 1108 that he advances. (*People v. Falsetta*, *supra*, 21 Cal.4th at p. 917; accord, *People v. Loy* (2011) 52 Cal.4th 46, 60-61; *People v. Wilson* (2008) 44 Cal.4th 758, 797.) We adhere to this binding authority and reject his due process challenge.

Defendant also argues section 1108 violates equal protection principles, arguing "the introduction of propensity evidence does in fact violate due process," and "[a]s such, strict scrutiny should apply." Following binding precedent, we have rejected defendant's due process argument and we therefore reject his contention strict scrutiny applies. Instead, we follow prior cases that have applied rational basis review and upheld section 1108 as consistent with the guarantee of equal protection of the laws. (*People v. Waples* (2000) 79 Cal.App.4th 1389, 1394-1395; *People v. Fitch* (1997) 55 Cal.App.4th 172, 184-185; see also *People v. Falsetta*, *supra*, 21 Cal.4th at p. 918 [citing *People v. Fitch* with approval].)

### D. *Evidence of T.T. Assault in 2010 - Evidence Code section 1101*

The trial court also admitted T.T.'s testimony concerning the 2010 assault under section 1101, subdivision (b), to show intent and a common plan or scheme for all the charged offenses. Defendant contends the trial court abused its discretion in admitting this evidence because it was too dissimilar to the charged offenses to be probative and because any probative value was outweighed by the improper prejudicial effect of the evidence.

### 1.    *The relevant trial court proceedings*

Before trial, as part of its ruling on defendant's motion to sever, the trial court ruled that the evidence of the Patricia crimes was admissible under section 1101, subdivision (b), to prove intent, modus operandi, and identity for the Terrey murder. We have considered and rejected defendant's challenge to the court's section 1101 ruling in Part II.A of this opinion. At about the same time, in response to motions in limine, the court tentatively ruled the evidence of the 2010 sexual offense involving T.T. was admissible under section 1101, subdivision (b), as to the sexual offenses against Patricia. The court later clarified that the evidence could be used as section 1101, subdivision (b) evidence on all counts.

Although the prosecutor did not argue the 2010 sexual offense evidence under section 1101, subdivision (b), the jury was instructed it could consider the evidence "for the limited purpose of deciding whether the defendant acted with the intent to commit the acts charged in this case, and the defendant had a plan or scheme to commit offenses alleged in this case."

### 2.    *Evidence Code section 1101*

Evidence that a defendant committed misconduct other than that currently charged is admissible if it is relevant to prove, among other things, motive, opportunity, intent, knowledge, preparation, identity, or the existence of a common design or plan. (§ 1101, subd. (b); *People v. Catlin*, *supra*, 26 Cal.4th at p. 145.) The admissibility of "other acts" evidence depends on (1) the materiality of the facts sought to be proved, (2) the tendency of the uncharged crimes to prove those facts, and (3) the existence of any rule or policy requiring exclusion of the evidence. (*People v. Steele* (2002) 27 Cal.4th 1230, 1243.) "When evidence is offered under Evidence Code section 1101, subdivision (b), the degree of similarity required for cross-admissibility ranges along a continuum, depending on the purpose for which the evidence is received. The least degree of similarity is required to prove intent. A higher degree is required to prove common plan, and the

29

highest degree to prove identity." (*People v. Scott*, *supra*, 52 Cal.4th at p. 470.) Trial courts have broad discretion in making evidentiary rulings. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1113, overruled on other grounds by *People v. Rundle* (2008) 43 Cal.4th 76, 151.

### 3. Common plan

"[A] defendant's uncharged misconduct is relevant where the uncharged misconduct and the charged offense are sufficiently similar to support the inference that they are manifestations of a common design or plan." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 401-402.) The plan itself need not be distinctive. (*Id*. at p. 403.)

We hold evidence of the 2010 sexual assault on T.T. was properly admitted under section 1101, subdivision (b), on a common plan (i.e., modus operandi) rationale. To be sure, T.T. was not a prostitute and defendant did have a different relationship with her than he did with Patricia or Terrey. But that is of no moment. The prosecution did not need to show that defendant only attacked prostitutes, or used precisely the same amount of violence on each victim, or even that he used violence only to obtain anal intercourse. Instead, what the prosecution needed to establish, and what the evidence and inferences therefrom in fact demonstrated, was that defendant's treatment of the three women was sufficiently similar to show that it was the manifestation of a common design or plan.

For all three women, each was necessarily in a vulnerable position isolated from others, defendant engaged vaginal or oral intercourse with each, and defendant proceeded to have anal intercourse with each, using violence during or after the intercourse. T.T. allowed defendant into her apartment out of affection. Patricia and Terrey appear to have gone with defendant on the promise of payment. Once the women were in isolated locations, defendant engaged in the expected consensual vaginal intercourse with Patricia and T.T., rendering them more vulnerable. He then sought anal intercourse from the two women, who refused. Defendant immediately used violence to obtain what he wanted. Not all of what transpired between defendant and Terrey was known, but the evidence does show he engaged in both vaginal and anal intercourse with her and she was

subjected to violence during or after the anal intercourse.  As we have already explained, *ante*, at page 16, the trial court and the jury could infer a physical confrontation with a nexus to the vaginal or anal sex occurred between the two.  In addition, the manner in which Terrey was killed—strangulation—was the same type of violence defendant inflicted on Patricia, lending further credence to the proposition that the crimes on both victims were the product of a common plan or modus operandi.

### 4.  *Evidence Code section 352*

Pursuant to section 352, a trial court may exclude evidence that is otherwise admissible under section 1101, subdivision (b) if the court finds the probative value of the evidence is outweighed by a substantial danger of undue prejudice.  Defendant contends the prejudicial potential of the uncharged sexual offense in 2010 was substantial and outweighed any probative value, and so the trial court abused its discretion in admitting the evidence.

As discussed, the T.T. evidence has solid probative value.  As he did in connection with his section 1108 claim, defendant claims the T.T. evidence was prejudicial because the jury (1) would have viewed defendant's forcible sodomy of T.T. as more offensive than his forcible sexual offenses against Patricia because he had a relationship with T.T., and (2) would have found T.T. was more credible than Patricia, who was a prostitute, and if the jury had doubts about Patricia's testimony, they were likely to overlook these doubts and convict him of the charges in this case to punish him for the more convincing but unpunished crime against T.T.  We reject this argument for the reasons we have already given in Part II.C.2.  The trial court's decision to admit under section 1101, subdivision (b) evidence defendant forced T.T. to engage in anal sex was not an abuse of discretion.

### 5.  *The trial court's ruling did not violate due process*

Defendant contends that the admission of the T.T. evidence under section 1101 violated his right to due process.  He argues that since "the admission of the challenged

31

evidence has been shown to be prejudicial under the *Watson* 'reasonable probability' test, it is necessarily not harmless under the federal constitutional standard of harmlessness beyond a reasonable doubt." We have found no error in the admission of the evidence and so reject defendant's due process claim.

### E.     CALCRIM No. 1191

Defendant argues that the trial court erred in giving a modified version of CALCRIM No. 1191 on the use of the evidence of the uncharged sex offense.[11] In relevant part and as given, CALCRIM No. 1191 told the jury: "The People presented evidence that the defendant committed a crime of Sodomy on [T.] T. that was not charged in this case. This crime is defined for you later in these instructions. [¶] You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged offense[]. Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. [¶] A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. [¶] If the People have not met this burden of proof, you must disregard this evidence entirely."

Defendant objects to the first paragraph of the instruction, specifically to the portion that reads "The People presented evidence that the defendant committed a crime of Sodomy on [T.] T. that was not charged in this case." Defendant contends this language suggested to the jury the prosecutor did in fact prove that the specified crime was actually committed by him and impermissibly shifted the burden of proof in favor of guilt.

---

[11]     The most recent version of CALCRIM No. 1191 provides: "The People presented evidence that the defendant committed the crime[s] of _____ *<insert description of offense[s]>* that (was/were) not charged in this case. (This/These) crime[s] (is/are) defined for you in these instructions." Thus, the trial court modified the instruction only by filling in the blanks.

32

The California Supreme Court has considered the exact instruction at issue here, CALCRIM No. 1191, and has found the instruction proper. (*People v. Villatoro* (2012) 54 Cal.4th 1152.) The instruction at issue in *Villatoro* began with language virtually identical to that of the instruction at issue in this case: "'The People presented evidence that the defendant committed the crime of rape as alleged in counts 2, 4, 7, 9, 12 and 15 and the crime of sodomy as alleged in count 14.'" (*Id.* at p. 1167.) The *Villatoro* Court noted the remainder of the instruction "clearly told the jury that all offenses must be proven beyond a reasonable doubt, even those used to draw an inference of propensity," and reasoned on that basis that "there was no risk the jury would apply an impermissibly low standard of proof." (*Id.* at p. 1168.) Our Supreme Court also noted that the jury was instructed using CALCRIM No. 220, which defines the reasonable doubt standard and reiterates the defendant is presumed innocent. (*Ibid.*) On this basis, the Court concluded the modified instruction "did not impermissibly lower the standard of proof or otherwise interfere with defendant's presumption of innocence." (*Ibid.*)

The instruction in this case expressly told the jury that it could consider the uncharged T.T. offense "only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged offense[]." The instruction further told the jury: "If the People have not met this burden of proof, you must disregard this evidence entirely." Thus, the instruction cannot reasonably be understood to tell the jury the prosecution had in fact proved the uncharged offense. Further, CALCRIM No. 1191 told the jury that the prosecution "must still prove each charge beyond a reasonable doubt." Thus, nothing in CALCRIM No. 1191 shifted the prosecution's burden of proof.

Even if CALCRIM No. 1191 were viewed as ambiguous, the instruction would not be considered in isolation. "If the charge as a whole is ambiguous, the question is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution." (*People v. Letner* (2010) 50 Cal.4th 99, 182, internal citations and quotations omitted; see also *People v. Huggins* (2006) 38 Cal.4th 175, 192.) Here, CALCRIM No. 220 properly instructed the jury as to the prosecution's burden of proof, that defendant was presumed innocent, and the fact that

33

charges were filed against him was not evidence the charges were true. CALCRIM No. 3515 reminded the jury that it should consider each count separately. The jury was also instructed on the elements of the uncharged offense of forcible sodomy. In light of these instructions, there is no possibility that the jury misunderstood or misapplied CALCRIM No. 1191.

We are accordingly unconvinced by defendant's comparison of CALCRIM No. 1191 to the instruction before the court in *People v. Owens* (1994) 27 Cal.App.4th 1155. The court in *Owens* considered former CALJIC No. 10.42.6, which stated in part, "The People have introduced evidence tending to prove that there are more than three acts of substantial sexual conduct or lewd and lascivious conduct upon which a conviction [for continuous sexual abuse of a child, in violation of section 288.5] may be based." (*Id.* at p. 1158.) The *Owens* court concluded the phrase "'tending to prove' conveyed the impression that the court believed the evidence showed that more than three acts were committed, relieving the prosecution of its burden of proof beyond a reasonable doubt." (*Ibid.*) CALCRIM No. 1191 does not use the "tending to prove" language that troubled the *Owens* court. Further, and despite its concern, the *Owens* court affirmed the conviction, explaining that reading the instructions as a whole, including the other instructions that told the jury the prosecution bore the burden of proof, was sufficient reason to conclude the jury was not misled. (*Id.* at p. 1159.) That is equally true here.

### F. Ineffective Assistance of Counsel

Defendant's trial counsel did not object to the prosecutor's comments in closing argument or to CALCRIM No. 1191. He contends that if we conclude he forfeited these claims as a result of counsel's failure to object, trial counsel provided ineffective assistance of counsel. We have not treated his CALCRIM No. 1191 claim as forfeited. We have found forfeiture of defendant's prosecutorial misconduct claim.

In order to establish a claim of ineffective assistance of counsel, a defendant must show that his counsel's performance fell below an objective standard of reasonableness, and that, but for counsel's error, a different result would have been reasonably probable.

34

(*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 694; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-218.) "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." (*Strickland v. Washington*, *supra*, 466 U.S. at p. 697.)

We have held that the challenged statement made by the prosecutor was not misconduct and that defendant surely suffered no prejudice even if it was. Defendant's ineffective assistance of counsel claim therefore fails.

### G. Defendant's Mid-Trial Request for a Continuance

On the date the prosecution was due to rest its case, defense counsel filed a motion to continue the trial to investigate newly received evidence of possible third party culpability for Terrey's murder, i.e., that someone other than defendant was the actual assailant. This was not the first attempt by defendant to pursue a third party culpability theory. The trial court denied the motion.

#### 1. Background

Approximately one week before trial began, defense counsel informed the court a man named Michael Wright "was friends with a pimp, named Gunther Daniels, who was robbed. [¶] Apparently somebody held an iron up to his face and he believed that Terrey . . . was the person responsible for that. He made statements to . . . Michael Wright . . . who was a friend of Terrey's to the effect that he did that to her." Defense counsel included Michael Wright in the list of witnesses he might call.

Later during jury selection, the trial court heard arguments on various motions in limine. During this hearing, it became clear that Wright had contacted police and told them someone referred to as "TR," possibly named Gunther Daniels, had killed Terrey. The trial court precluded defense counsel from mentioning this evidence in his opening statement, but agreed to reconsider the ruling if defense counsel identified an exception to the hearsay rule for the statements purportedly made to Wright.

On the day the prosecution was scheduled to rest its case, defense counsel informed the court defendant said he heard his cellmate tell essentially the same story that Wright told police about the robbery, that is, the branding of a pimp with an iron, and the retaliatory killing of Terrey. According to defendant's cellmate, the pimp was "Tiny Black Rag" or "TR," and someone named "T. Gutta" had killed Terrey for this "TR." Defense counsel was sure the cellmate was not Wright, but was unsure of anything else about him, including his name or booking number. The inmate refused to provide this information to defendant and had indicated that he did not wish to speak to defense counsel or his investigator.

### 2. Trial court's ruling

Defendant moved for a continuance to investigate the information defendant claimed to have heard from his cellmate. The trial court denied the motion. After verifying that defense counsel did not know the name of the witness, the trial court found that "it's just too speculative. And we're talking about hearsay and double hearsay, and you don't have specifics about whether this T. Gutta person is actually connected to Terrey W. This was a situation that apparently was on the news, and so oftentimes a lot of individuals who are in custody they say things for other purposes as opposed to saying things to be accurate and truthful in their conversations. So I don't think there is enough there to warrant granting the continuance."

### 3. Denial of the continuance was not an abuse of discretion

A defense request for a continuance during a criminal trial may be granted only for good cause. (Pen. Code, §1050, subd. (e).) "The matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process . . . ." (*Ungar v. Sarafite* (1964) 376 U.S. 575, 589; *People v. Hajek*, *supra*, 58 Cal.4th at p. 1181 [abuse of discretion standard applies].) Absent an abuse of discretion and prejudice, reversal is not warranted. (*People v. Mungia* (2008) 44 Cal.4th 1101, 1118.)

36

A defendant must diligently prepare for trial and is not entitled to a continuance if he is unjustifiably dilatory. (*People v. Strozier* (1993) 20 Cal.App.4th 55, 61.) An important factor for a trial court to consider in ruling on a motion for a continuance is whether the continuance would be useful. (*People v. Beeler* (1995) 9 Cal.4th 953, 1003; *Owens v. Superior Court* (1980) 28 Cal.3d 238, 251.)

Here, the identity of the inmate defendant claimed to have talked to was unknown, and there appeared to be no way to ascertain his name or booking number in any reasonable period of time. Defense counsel described the inmate as afraid and unwilling to cooperate with the defense. The information provided by the inmate added little to the information already known about claims a third party had killed Terrey. There was no reason to believe that the inmate's information would lead to any additional information on this topic that had not already been uncovered. Because defense counsel did not show that a continuance would be useful, the trial court did not abuse its discretion in denying the motion for a continuance. In addition, the trial court did not act arbitrarily in denying the continuance request, and so there was no violation of defendant's right to due process. (*People v. Doolin*, *supra*, 45 Cal.4th at p. 450 [when assessing whether denial of continuance was so arbitrary as to deny due process, reviewing court considers reasons presented to the trial judge; likelihood the anticipated benefit from the continuance will in fact result; burden on witnesses, jurors, and the court; and whether substantial justice will be accomplished or defeated by a granting motion]; *People v. Howard* (1992) 1 Cal.4th 1132, 1172.)


H.      *Imposition of Concurrent Term for Assault Conviction*

Defendant contends the trial court erred in imposing a concurrent term for his count two conviction for the assault of Patricia. He contends that Penal Code section 654 required the sentence to be stayed.

Penal Code section 654 prohibits punishment for multiple crimes arising from a single indivisible course of conduct. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1207-1208.) The application of section 654 "turns on the defendant's objective in violating"

37

multiple statutory provisions rather than temporal proximity. (*People v. Britt* (2004) 32 Cal.4th 944, 951-952.) If all of the crimes for which the defendant was convicted were merely incidental to or were the means of accomplishing or facilitating one objective, he may be punished only once. (*Ibid.*) Multiple punishment is proper if the defendant entertained multiple independent criminal objectives. (*People v. Harrison* (1989) 48 Cal.3d 321, 335.) Section 654 does not cover acts of gratuitous violence or other criminal acts far beyond those reasonably necessary to accomplish the original offense. (*People v. Nguyen* (1988) 204 Cal.App.3d 181, 191.)

The question of whether Penal Code section 654 applies in a given case is a question of fact for the trial court, which is vested with broad latitude in making its determination; its findings will not be reversed on appeal if there is any substantial evidence to support them. (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.) This includes the trial court's implied and express findings. (*People v. Jones*, *supra*, 103 Cal.App.4th at p. 1143; *People v. Nguyen*, *supra*, 204 Cal.App.3d at p. 190.)

Here, the trial court was within its discretion when it implicitly found the violence which defendant inflicted upon Patricia, who was isolated and helpless, was far beyond the force necessary to simply overcome her resistance and accomplish the rape. Thus, the trial court's decision to impose a separate concurrent term for the assault did not violate Penal Code section 654.

### I. *Restitution Fine*

Defendant claims that the trial court improperly imposed a $10,000 restitution fine under Penal Code section 1202.4, subdivision (b) based on judicially determined facts. He argues this violated his rights to a jury trial and to due process under *Apprendi v. New Jersey* (2000) 530 U.S. 466 and its progeny, including the Supreme Court's recent decision in *Southern Union Co. v. United States* (2012) 567 U.S. ___ [132 S.Ct. 2344, 183 L.Ed.2d 318] (*Southern Union*).

38

### 1. *Trial court proceedings*

At sentencing, the court stated, "The court is going to order you to pay direct restitution to the victims in all counts pursuant to Penal Code section 1202.4(f). The court will retain jurisdiction on that matter since we don't know the amount at this time, but we'll retain jurisdiction and specify the amount of restitution at a later date." The court also imposed a restitution fine pursuant to Penal Code section 1202.4, subdivision (b)(1): "You're ordered to pay a mandatory restitution fine pursuant to Penal Code section 1202.4(b)(1), and the court is going to utilize the formula[] in Penal Code section 1202.4(b)(2), and impose the maximum amount which is $10,000, that has to be paid to the restitution fine fund."

### 2. *Analysis*

Penal Code section 1202.4, subdivision (b) provides: "In every case where a person is convicted of a crime, the court shall impose a separate and additional restitution fine, unless it finds compelling and extraordinary reasons for not doing so and states those reasons on the record." The court has discretion to set the amount of the fine, commensurate with the seriousness of the offense. (Pen. Code, § 1202.4, subd. (b)(1).) The defendant's ability to pay the fine is relevant if the court imposes a fine above the statutory minimum. (Pen. Code, § 1202.4, subd. (c).) Express findings by the court or a separate hearing are not required. (Pen. Code, § 1202.4, subd. (d).)

Defendant argues the $10,000 restitution fine imposed under Penal Code section 1202.4, subdivision (b), must be reversed under *Southern Union.* His argument is a jury finding was required on the question of whether defendant had the ability to pay a restitution fine above the statutory minimum and on the gravity of the crimes and the nature of their commission.

As defendant concedes, this Court has already held that "*Apprendi* and *Southern Union Co.* do not apply when, as here, the trial court exercises its discretion within a statutory range." (*People v. Kramis* (2012) 209 Cal.App.4th 346, 351 (*Kramis*).) In *Kramis*, the trial court imposed a $10,000 restitution fine pursuant to Penal Code section

39

1202.4, subdivision (b), as the trial court did here.  (*Id.* at p. 349.)  We asked the parties in that case for their views on whether *Southern Pacific* affected the validity of the restitution fine and held it did not:  "Under the applicable version of section 1202.4, subdivision (b)(1), absent compelling and extraordinary circumstances, the trial court was required to impose a restitution fine in an amount between $200 and $10,000.  The $10,000 section 1202.4, subdivision (b) restitution fine imposed . . . was within that statutory range.  The trial court did not make any factual findings that increased the potential fine beyond what the jury's verdict—the fact of the conviction—allowed.  Therefore, *Apprendi* and its progeny do not preclude its imposition.  [Citation.]"  (*Kramis*, *supra*, 209 Cal.App.4th at pp. 351-352; see also *People v. Urbano* (2005) 128 Cal.App.4th 396, 405-406.)  We follow our prior decision in *Kramis* and hold the Penal Code section 1202.4 fine was properly imposed.

DISPOSITION

The judgment of conviction is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

BAKER, J.

We concur:

TURNER, P.J.

RAPHAEL, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.